J-S59029-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: C.L., C.L., MINOR CHILDREN | : IN THE SUPERIOR COURT OF : PENNSYLVANIA : : : : |
| APPEAL OF: D.L., BIRTH FATHER | : No. 727 WDA 2015 |

Appeal from the Judgment entered April 15, 2015,
Court of Common Pleas, Washington County,
Orphans' Court at No(s): 63-OC-2013-1517
and 63-OC-2013-1516

| | |
|---|---|
| IN RE: ADOPTION OF: C.L., C.L., MINOR CHILDREN | : IN THE SUPERIOR COURT OF : PENNSYLVANIA : : : : |
| APPEAL OF: D.L., BIRTH FATHER | : No. 728 WDA 2015 |

Appeal from the Order April 15, 2015,
Court of Common Pleas, Washington County,
Orphans' Court at No(s): 63-OC-2013-1516
and 63-OC-2013-1517

BEFORE:  BOWES, DONOHUE and FITZGERALD*, JJ.

MEMORANDUM BY DONOHUE, J.:                **FILED SEPTEMBER 24, 2015**

Appellant, D.L. ("Father"), appeals from the order of the trial court terminating his parental rights to his two children, C.L. (born June 12, 2010) and Ch.L. (born September 14, 2011) (together, the "Children").  For the reasons that follow, we affirm the trial court's order granting the petition to terminate parental rights filed by the Washington County Children and Youth Services Agency ("CYS").

---

*Former Justice specially assigned to the Superior Court.

In its written opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, the trial court set forth the following facts relevant to Father's appeal:

> The Father is [] from Lakeland, Florida. The Father testified that he moved to Washington County in 2009. (T.T. 11/5/14, P. 63) However, Dr. Lee reported in his evaluation of the Father that he reviewed records from an inpatient hospitalization of Father in Washington Hospital in 2003. (Exhibit 1, P. 3) The Mother and Father are not married. (T.T. 11/5/14, P. 27) The Father is married but separated from wife Christina. Christina and Father have a daughter Nina, born May 2012. Nina is in the custody of mother Christina and the Father has supervised visitation. The Father has a criminal conviction from Florida in 2008; the Father pled guilty to "Unlawful Sexual Activity with Certain Minors". Due to this conviction, Father is required to report as a Megan's Law offender under a Tier I offense, the lowest category pursuant to Florida law. (Exhibit 5) The Father receives social security disability (SSI). (T.T. 8/6/14, P. 125; 11/5/14, P. 21)
>
> CYS first became involved with the family on September 14, 2011, at the birth of Ch.L. The hospital staff reported concerns to CYS that Mother lacked any identification and that Father was very controlling of Mother, answering questions for her. (T.T. 8/6/14, P. 95) At the time, the Mother, Father, the two children and the Father's wife were all living together. (T.T. 11/5/14, P. 29) In early 2012, after an argument between Mother and Father's wife Christina, the Mother and [Children] moved to a women's shelter in Allegheny County. (T.T. 11/13/14, P. 30-32) After a few months, they left and returned to the home of the Father. In October of 2012, CYS located the family and went to the residence. CYS found that the home was in a deplorable and filthy condition and was inadequate

for the seven adults and two children living there. (T.T. 8/6/14, P. 99) The Children were removed by emergency shelter order and placed in foster care on October 16, 2012, where they have remained. (T.T. 8/6/14, P. 100)

The Children were adjudicated dependent on December 3, 2012. The allegations of dependency were deplorable living conditions, the Father's status as a Megan's Law offender and his serious mental health issues and the lack of verifiable identity of Mother. (Exhibit 6; Dep. Pet. P. 5 of 5) Over the course of the dependency case, the parents have been ordered to obtain and maintain appropriate housing, to complete a parenting educational training and to obtain a mental health evaluation and follow through with any treatment. The Father was also ordered to complete an anger management course and obtain a sexual offender assessment and follow through with any recommended treatment. (Exhibit 6; T.T. 8/6/14, P. 101)

The parents have moved at least four times in the last two years. They lived in a trailer in Canton Township, then moved to Washington, then to West Alexander and in January of 2014 to Eighty-Four, Pennsylvania, where they have remained. (T.T. 8/6/14, P. 118) Their current housing was found with the assistance of CYS and is appropriate, although some issues of cleanliness have arisen. (T.T. 8/6/14, P. 170) The parents completed the parenting program through Justice Works. (T.T. 8/6/14, P. 105) …

The Father completed anger management in February 2014. (T.T. 8/6/14, P. 175) During the course of treatment for anger management, he continued to have outbursts of anger; on November 25, 2013 he verbalized that he wanted to kill the CYS caseworker. (Id.) The Father had a sexual offender's assessment in December 2012 and was found to be at a moderate risk for recidivism. (Exhibit 3) He did not begin treatment for sexual

offenders until June 2014; the treatment consists of weekly group counseling sessions and twice monthly individual sessions. (T.T. 11/5/14, P. 83, 86) Treatment is expected to take two years. (T.T. 11/5/14, P. 87)

The Father's mental health issues date back to his teenage years. He had a voluntary psychiatric hospital admission in 2003. He was diagnosed as bipolar and was prescribed Lithium, Clozaril, Depakote and Zyprexa and recommended continued treatment. The Father obtained a psychiatric evaluation by Dr. Stephen Lee of Washington Communities Human Services, Inc. Dr. Lee diagnosed the Father with bipolar disorder (Axis I). (Exhibit 1) He recommended (urgently) medication management and individual therapy. He found that Father did not present suicidality, but homicidality was present. (Exhibit 1) In the psychological evaluation by Dr. Rosenblum in 2014, the Father was diagnosed with bipolar disorder with psychotic features (Axis I), impulse control disorder NOS (Axis I), and mixed personality disorder with narcissistic, antisocial and borderline features (Axis II). (Exhibit 2) His IQ was found to be 99. The Father began mental health counseling in May of 2014. (T.T. 8/6/14, P. 187)

Throughout the history of the case, the Father has relayed grandiose and incredible statements to the many social workers and other professionals involved with this family and to this Court in juvenile dependency proceedings. The Father has reported having a genius IQ, having completed graduate school at Brigham Young University, serving in the military and being injured in Iraq, and building a large home in Marianna, Pennsylvania, all of which are not true.

The parents have weekly supervised visitation for five hours. (T.T. 8/6/14, P. 123) Even though the Children were not dirty, the Father insisted on bathing them during each visit, stating the Children

got dirty and that they enjoy bath time. (T.T. 11/13/14, P. 72; 11/5/14, P. 56) The Father accused the case aide of inappropriate leering at his daughter during the bath time. (T.T. 11/5/14, P. 57)

Dr. Rosenblum conducted an interactional evaluation with the parents and the Children and the foster parents and the Children. He supported the termination of the parents' rights. (T.T. 8/6/14, P. 44) The CYS caseworker testified that, in her opinion, the Children would not suffer any detrimental effects if the parents' rights were terminated. (T.T. 8/6/14, P. 129-30) The Guardian Ad Litem also supported the termination of the parents' rights. (T.T. 11/13/14, P. 69)

Trial Court Opinion, 6/12/2015, at 2-5.

CYS filed a petition to terminate Father's parental rights on December 24, 2013. The trial court conducted evidentiary hearings on August 6, 2014, November 5, 2014, November 5, 2014, and November 13, 2014. On April 15, 2015, the trial court issued an order granting CYS's petition and terminating Father's parental rights. On appeal, Father contends that the trial court erred because the evidence presented by CYS was "insufficient to sustain" the trial court's decision to terminate his parental rights.

We review the appeal from the termination of parental rights in accordance with the following standard.

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported

- 5 -

by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Pennsylvania Supreme Court] discussed in [*In re: R.J.T.*, 9 A.3d 1179 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review in these cases. [The Supreme Court] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some internal citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained:

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

When deciding a case falling under section 2511, the trial court must engage in a bifurcated process. *In re B.C.*, 36 A.3d 601, 606 (Pa. Super. 2012). In that analysis,

> [t]he initial focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies at least one of the nine statutory grounds in section 2511(a). If the trial court determines that the parent's conduct warrants termination under section 2511(a), then it must engage in an analysis of the best interests of the child under section 2511(b), taking into primary consideration the developmental, physical, and emotional needs of the child.

*Id.*

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). Here, the trial court terminated Father's parental rights under section 2511(a)(1), (2), (5), (8) and (b). We will analyze the trial court's decision to terminate Father's parental rights under section 2511(a)(8) and (b).

These sections provide:

### § 2511. Grounds for involuntary termination

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)-(b).

Termination of parental rights under Section 2511(a)(8) requires CYS to demonstrate the following factors: (1) the child has been removed from parental care, (2) 12 months or more have lapsed from the date of removal; (3) the conditions which led to the removal or placement of the child

continue to exist; and (4) termination of parental rights would best serve the needs and welfare of the child.  *In re K.M.*, 2012 160, 53 A.3d 781, 789 (Pa. Super. 2012) (quoting *In Re Adoption of M.E.P.*, 825 A.2d 1266, 1275–1276 (Pa. Super. 2003)).

The first two elements in this analysis are established, as CYS removed the Children from Father's care in October 2012, and they have resided in foster care since that date.  N.T., 8/6/2014, at 99.  With respect to the third element, the certified record on appeal supports the trial court's decision.  The reasons for the removal of the Children from Father's care included, inter alia, Father's need for anger management and mental health treatment.  *Id.* at 101-02.  While it is true that Father completed anger management counseling in November 2013, the trial court questioned its effectiveness, pointing out that Father threatened the life of a caseworker. Trial Court Opinion, 6/12/2015, at 3.  The record supports this finding, as there was testimony that just three days prior to completing his anger management counseling, Father indicated to John Bert of Justice Works that he was "going to put a hole in [the CYS caseworker's] head."  N.T., 8/6/2014, at 111.

Regarding his mental health issues, Father delayed beginning his treatment for more than a year after the Children had been removed from his care, and not until after the petition to terminate his parental rights had been filed.  *Id.* at 115.  More importantly, Father's mental health issues are

both severe and, with respect to at least one significant diagnosis (personality disorder), not amenable to treatment. The trial court found as follows:

> He was diagnosed with an Axis II disorder; the Axis II diagnosis of personality disorder is not responsive to treatment and is ingrained and lifelong. That is, Father's serious mental health disorder is not easily treatable to behavior modification. The Father is not only bipolar, he "displays prominent antisocial personality characteristics and evidence of an impulse control disorder. He has very few inhibitions and tends to be reckless, impulsive and exercises poor judgment in his interactions with others." (Dr. Rosenblum's Report, Exhibit 2). He is "tempermental, reckless and evidencing an extremely unstable personal adjustment and lifestyle." (Exhibit 2). His ability to benefit from treatment is very limited. The Father's treatment as a sexual offender is only in its beginning stages and can take upward of two years to complete. Additionally, untreated mental issues pose a barrier to successful treatment for sexual offenders. Since Father had also just begun mental health treatment, any cognizable progress was yet to be seen.

Trial Court Opinion, 6/12/2015, at 8-9. Based upon our review of the certified record on appeal, including the testimony and reports of Dr. Stephen Lee and Dr. Neil Rosenblum, the trial court has correctly summarized the evidence regarding Father's current mental health issues that CYS presented at the evidentiary hearings.

On appeal, Father disagrees with the trial court's findings. He argues that CYS's contentions "can be boiled down to a fear that Father will at some time behave erratically and harm his children." Father's Brief at 11. Father

contends that this "conjecture" is belied by his actions, including the absence of any evidence of recent anger outbursts demonstrating ongoing anger management issues. *Id.* at 13.

Unfortunately, the Father's arguments amount to an attack on the credibility of the opinions of CYS's mental health experts. As is clear from its Rule 1925(a) opinion, however, the trial court found their testimony regarding the state of Father's mental health to be credible. Trial Court Opinion, 6/12/2015, at 8-9. This Court is bound by the trial court's determinations in this regard, as "[t]he trial court is free to make all credibility determinations, and may believe all, part, or none of the evidence presented." *In the Interests of J.F.M.*, 71 A.3d 989, 992 (Pa. Super. 2013). Moreover, the courts of this Commonwealth have long held that a child's life "simply cannot be put on hold in the hope that [the parent] will summon the ability to handle the responsibilities of parenting." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003) (citing *In Re: J.T. and R.T.*, 817 A.2d 505, 509 (Pa. Super. 2003)). As a result, we must conclude that the trial court's decision that Father's serious mental issues and the concomitant need for treatment, which were conditions that lead to the removal of the Children, continue to exist and likely will continue to persist well into the future. CYS thus presented clear and convincing evidence to establish the third element under section 2511(a)(8).

The fourth element under section 2511(a)(8) requires CYS to show that termination of Father's parental rights would best serve the needs and welfare of the Children. Under Section 2511(a), the focus is on the parent, whereas the focus in Section 2511(b) is on the child. *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008). The "best interests of the child" analysis under Section 2511(a)(8) therefore accounts for the needs of the child in addition to the behavior of the parent. *In re C.L.G.*, 956 A.2d 956 A.2d 999, 1008-09 (Pa. Super. 2008) (en banc); *In re I.J.*, 972 A.2d 5, 12 (Pa. Super 2009). This analysis requires consideration of "[i]ntangibles such as love, comfort, security, and stability." *In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006). To this end, this Court has indicated that the trial court "must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *C.L.G.*, 956 A.2d at 1009. The continuity of relationships is important because severing close parental ties is often extremely painful. *In re Adoption of K.J.*, 936 A.2d 1128, 1134 (Pa. Super. ).

Azure Hixenbaugh, the CYS caseworker, testified that based upon her observations, there was no bond between the Children and their parents (including Father) that was of benefit to the Children. N.T., 8/6/2014, at 130. Dr. Rosenblum testified that while he believed that the parents loved the Children, he saw no similar loving relationship between the Children and their parents. *Id.* at 46-47. Instead, Dr. Rosenblum described the Children

as "comfortable" with their parents, with the older child (C.L.) exhibiting more of an attachment than Ch.L. ***Id.*** at 46. Both Ms. Hixenbaugh and Dr. Rosenblum agreed that severing the relationship between the Children and Father would not result in any detrimental effect to the Children. ***Id.*** at 47-48, 130. According to Dr. Rosenblum, the Children have adapted to life with their pre-adoptive foster parents, from whom they derive all of their "nurturing, direction and emotional support," and that as a result termination was not "something that would cause the children any significant adjustment concerns." ***Id.*** at 47-48. Both Ms. Hixenbaugh and Dr. Rosenblum also agreed that the Children have strong bonds with their pre-adoptive foster parents and that termination of parental rights and adoption were in the Children's best interests. ***Id.*** at 44, 130; ***see In re T.S.M.***, 71 A.3d 251, 268 (Pa. 2013) ("Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents.").

Turning to section 2511(b), on appeal Father does not challenge the trial court's factual findings or legal determination under this provision. For the reasons set forth hereinabove, including the testimony of Ms. Hixenbaugh and Dr. Rosenblum, no basis exists in the certified record to conclude that the trial court erred in this respect.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/24/2015